# OHIO NISI PRIUS REPORTS

## NEW SERIES—VOLUME XIV.

CAUSES ARGUED AND DETERMINED IN THE SUPERIOR,
COMMON PLEAS, PROBATE AND INSOLVENCY
COURTS OF OHIO.

### COMPENSATION FOR CARE AND SERVICES RENDERED TO A DECEDENT.

Common Pleas Court of Hamilton County.

LUCY E. SELLERS v. JOHN R. SAYLER, EXECUTOR.

Decided, January 20, 1913.

*Contract for Services—Rendered to an Aged Couple—Arrangement for Testamentary Compensation—Supplemented by Subsequent Written Agreement for a Gift of Bank Stock—Compensation is Thus Made Large—But Agreement is Enforced—Statute of Limitations Not Applicable.*

For a period of twelve years the plaintiff cared for the aged testator and during part of that time for his imbecile wife also. The testator was wealthy, but eccentric and parsimonious, and insisted on living under repulsive conditions. The plaintiff was not a relative, and the promise to her, in the first instance, was that she should be suitably compensated by will, and such a provision was made by the testator, but the plaintiff was not satisfied therewith and procured from him a secret agreement in writing that she should receive, at his death, certain valuable bank stock in addition to the provision made for her in his will. The compensation

thus provided was larger than she could have expected on a *quantum meruit*. It was admitted that she rendered faithful service.

*Held:* The mental competency of the testator to make the agreement not being in dispute, and in view of all the facts—the certainty with which the amount of additional compensation is fixed, the character of the services rendered, the conditions under which they were rendered, the ample estate, the risk of relying on merely testamentary compensation, and the fact that to enforce the agreement will work injustice to no one—the agreement must be regarded as established and the estate as liable in damages for the value of the stock so promised, notwithstanding her mercenary motive, the excellent bargain which she drove and the defective character of the agreement upon which she relies.

*Healy, Ferris & McAvoy*, for plaintiff.
*Peck, Shaffer & Peck*, contra.

HUNT, J.

This is. an action by Lucy E. Sellers against the executor of Asa Van Wormer, deceased.

In the amended petition it is alleged that from April 13, 1897, to August 11, 1909, the date of the testator's death, at testator's request plaintiff rendered services in the care of testator and his wife, and to the testator after the wife's death in the care and attention given to them at their home; that the testator promised to pay therefor by making provision in his will sufficient to provide for her for the remainder of her life, which compensation was to be agreed upon between them and satisfactory to plaintiff; and that such services were worth the sum of $7 per day, to-wit, the sum of $31,521, of which she has received the sum of $2,600.

Plaintiff further alleges that by will and codicil the testator made certain provisions for her, but in each case after being informed thereof she expressed her dissatisfaction, and that testator thereupon in consideration of her continuing such services, agreed to give and bequeath to her in addition to provisions already made, 150 shares of the stock of the First National Bank, and that in evidence thereof gave to plaintiff the following instrument:

"CINCINNATI, O., Septembber 16, 1907.
"In addition to the seven thousand dollars invested in $3\frac{1}{2}\%$ Cincinnati Viaduct Bonds, one hundred dollars invested in a United States Government Bond, and sixty shares of Cincinnati Street Railway Stock, I, Asa Van Wormer, give and bequeath to Lucy Sellers for taking care of me and my home, at my death, one hundred and fifty shares of First National Bank Stock.

"If Lucy Sellers should die before I do, then at my death the one hundred and fifty shares of First National Bank Stock goes to her daughter, Stella Sellers.
                    "(Signed) ASA VAN WORMER."

Plaintiff further says that said Asa Van Wormer during the time of plaintiff's services gave away more than $100,000 to charitable and benevolent institutions, and left an estate in personal property of $442,713.03, in which were 414 shares of First National Bank Stock, 150 of which were by codicil bequeathed to one Henry Rohlfing; that said executor refused upon demand to deliver to plaintiff 150 shares of said stock; that on October 10, 1911, she presented to the executor a claim for services in the sum of $31,521, less a credit of $2,600 as herein set forth, which claim was disallowed.

Plaintiff asks a specific performance of the alleged contract as to the 150 shares of stock and that the executor may be found to hold said shares in trust for plaintiff, or in the alternative, for a judgment for the value of such shares or the alleged reasonable value of such services.

Plaintiff's original petition filed November 30, 1910, was simply for services rendered at testator's request, the reasonable value of which is alleged to be $7 per day, or $31,521, with a credit of $2,600.

The amended petition filed December 8, 1911, was as hereinabove set forth. It is not divided into counts or separate causes of action.

The defendant by answer admits the rendition of services, but denies that they were to the extent or of the value claimed, and further claims both partial and full payment thereof, and further alleges a different agreed compensation therefor than alleged by plaintiff, full payment thereof and the making by

testator of three separate provisions in favor of plaintiff in his will and codicils and the acceptance by plaintiff of certain property held for her in trust by the Fifth-Third National Bank in pursuance of one of said provisions.

Defendant further sets up the refusal by defendant in 1909 and again on September 22, 1910, to consider any claim of plaintiff under the instrument of September 16, 1907, and the failure of plaintiff at any time to present to him any duly verified claim, except the claim for services at $7 per day from April 13, 1897. to August 11, 1909, presented September 22, 1910, and rejected October 20, 1910, and alleges his appointment as executor without bond on September 18, 1909, and the giving of due notice thereof beginning September 19, 1909.

When Asa Van Wormer died on October 11, 1909, he was about ninety years old.   He left an estate of about $450,000 in stocks and bonds.   Nieces and nephews were his nearest relatives. His last will was made June 29, 1889, and between that day and June 27, 1909, at various times he added fourteen codicils thereto, specifically disposing of innumerable stocks and bonds to nieces, nephews and to charitable, educational and benevolent institutions.   During the ten or twelve years prior to his death he had given away about $100,000 to such institutions.

For many years prior to 1886 he was engaged in business on Court street, Cincinnati, dealing in butter and eggs and farm produce.   He could read and write, but otherwise except as acquired in such business and in reading newspapers, he had no education or culture.   By unusual thrift and economy in business and household, and the devoting of all his time to business to the exclusion of all social or intellectual life, he had accumulated bonds and stocks which after his retirement from business in 1886, grew into a fortune of over half a million dollars.   Until some time in the seventies he and his wife lived over the Court street store; then he moved to Winton Place, living there in the same manner as on Court street.

When his wife became a physical and mental wreck he was compelled to bring to his home some one to care for her and the house.   Several undertook the task; some left of their own ac-

cord.  Finally plaintiff and her fourteen year old daughter were induced to come to the house.  The plaintiff as a girl had lived with the Van Wormers, but had married and gone to Detroit, where her husband died, leaving her a daughter then about nine years old.  She seems to have been left sufficient means to support herself and her daughter several years in Detroit and afterward in Cincinnati.  She had not been in Cincinnati long before Asa Van Wormer induced her on April 13, 1897, to come to his house.  The testator's imbecile wife died the following October.

It is neither pleasant nor necessary to go into the dreary and sordid details and parsimonious economies of life at Asa Van Wormer's home during the time in question, accentuated by age, by a slight stroke of paralysis, by nauseous habits about his home, and by a couple of accidental injuries from which he gradually recovered.

The casual visitor to such a home does not always realize such conditions.  They weigh most heavily and blightingly upon those who share such a home and whose lives are dominated by such environment.  Obsessed by his deep rooted ideas of economy and accumulation of money, all faculty to enjoy what the normal man, even the common laborer, would regard as reasonable necessities, had long since been atrophied by disuse. Any plumbing conveniences in the house or even in the kitchen were regarded as unnecessary luxuries.  His house would have been shunned by relatives, acquaintances and endowment seeking philanthropists, except for his wealth.

When the plaintiff and her daughter went to the Van Wormer home, it was undoubtedly by reason of promises more or less indefinite, of future financial recompense in addition to the regular weekly payment of three or four dollars for immediate necessities, because after the making of the two codicils on May 26, 1898, and December 14, 1898, in which provisions were first made for her, she emphatically expressed her dissatisfaction not only to the testator, but to others in his presence, who, although present in court, made no denial.  She threatened to leave.  A third provision in favor of plaintiff was made in a codicil, executed April 4, 1904.

The plaintiff did not go to testator's home from any motive of duty or affection, and no such relation was pretended or supposed to exist. Her motive was purely mercenary and so understood. The testator apparently relied upon no other. He wanted to be permitted to live in his own way, and to have in his home familiar rather than strange faces. To secure nec- · essary services from those who would endure his method of living he was unwilling, or at least never offered, to pay to anyone the reasonable value thereof as such services were rendered; preferring to promise compensation conditioned upon the services being continued until his death, payable after his death, and supposedly contingent upon his making the necessary testamentary provision therefor. Subject to such contingency as to compensation for services rendered in such a household, substantial compensation was naturally expected.

Copies of his will and codocils were kept at the house and were there frequently read to and by the testator. The plaintiff knew what provisions were being made for her. After September 16, 1907, the date of the instrument in question, there is no evidence of the expression of any dissatisfaction by plaintiff. Except that the signature to such instrument is admitted to be the signature of Asa Van Wormer, the evidence of its execution is the testimony of the plaintiff's daughter alone, the plaintiff being incompetent under the law.

Under the conditions under which the daughter grew from girlhood to womanhood, conditions created by Asa Van Wormer himself, it is not surprising that the question of what testamentary disposition Asa Van Wormer was to make of his accumulations, became with the daughter as with every one else who visited the house or had anything to do with him, the expressed or unexpressed motive of all attentions to him. · The question was ever present and became the primary question of the daughter's life while in the Van Wormer home. Her observation and testimony must be considered in connection with such perspective. There is no evidence, however, that either she or the plaintiff or any one else, attempted or was able at any time to influence Asa Van Wormer to sign anything which he was un-

willing to sign, or did not understand, or for the purport of which he took another's statement. He thoroughly knew the value of his signature.

Before the date of such instrument he had had innumerable conferences with his attorney and others with regard to testamentary provisions. He had already made not only his will, but had added at that time twelve codicils. If he had the comprehensive intelligence necessary to understand the phraseology, legal, financial and otherwise in such will and codicils—and it is conceded that he had—and that he was in the habit of frequently re-reading them and discussing them, he must have had sufficient intelligence to have absorbed into his vocabulary and to understand the simple, concise and comprehensive terms of the instrument of September 16, 1907.

Under all the circumstances plaintiff had as much, if not more moral right to what the instrument purports to give her, as any of the prospective beneficiaries of his bounty. It is true that old people, such as Asa Van Wormer, unless influenced by some one so to do, frequently fail to appreciate the value of such services as were rendered by the plaintiff, whether rendered by reason of affection, duty, necessity or pecuniary compensation, and if the plaintiff had been less mercenary and less positive in her insistence on proper future compensation, the testator would probably have considered his few gifts and the relatively paltry testamentary provision of $1,000 first made for her as full and adequate compensation. The plaintiff, however, while she faithfully served the testator, and made both the testator and his home as comfortable and presentable as possible under the circumstances, had no intention of leaving her compensation to his mere voluntary bounty, and except for some such provision as made by the instrument of September 16, 1907, she would undoubtedly have been heard from in the subsequent years of her service. Something must have been done by the testator about that time to have satisfied her. He had by codicil executed June 7, 1905, given to Henry Rohlfing 150 shares of First National Bank stock in addition to former provisions in his favor. The plaintiff was legally entitled to liberal compensation and was

apparently as much entitled to mere bounty as Henry Rohlfing. A satisfactory promise or provision must have been made by the testator or supposed by the plaintiff to have been made by him.

The only doubt as to whether the instrument in question was executed in accordance therewith arises from the daughter's testimony as to the manner in which it was prepared and signed. The testator and the daughter and mother by reason of familiarity with the pages upon pages of the will and codicils already made, undoubtedly knew the ordinary formalities necessary in the making of a will or codicil. But Asa Van Wormer had always called to his assistance his legal counsel in making any testamentary provision. There is no evidence that such legal counsel was adverse to any provision in favor of the plaintiff, or that the plaintiff or her daughter supposed that such was a fact. Why then were not such formalities observed and why was not the instrument of September 16, 1907, brought to the attention of such counsel? He was a frequent visitor to the house. It is claimed that the testator told plaintiff to tell no one of the instrument, but after his death to present it to his executor, who would give her the stock. The plaintiff knew that the instrument as a will or codicil was defective. Why did she, anxious to secure her compensation, rely upon a defective instrument, without consulting some supposedly competent person as to its effect, notwithstanding the injunction of secrecy?

That the testator could have clearly understood the paper is conceded, but no instrument dictated or written by the testator in his lifetime is as clear, concise and comprehensive as such instrument. There is not an unnecessary word, or the lack of a necessary word. The provisions are in an unexceptionally orderly sequence. Could the testator without reading from some memoranda have dictated such instrument word by word without making any correction? The daughter says he did. The instrument is almost too perfect to have been executed as testified to by the daughter, and by reason of defective execution, its effect almost too manifestly precarious to have been thereafter implicity relied upon by plaintiff. The improbability is not of the alleged promise, but of the execution of the instrument in the manner claimed.

Such improbability might be a determining factor in this case if any evidence had been offered of repose of confidence, loss of intelligence or will power or subjection to undue or other influence, in the relation of testator to plaintiff or others, and some such condition might be naturally inferred, except for the evidence to the contrary.

In view, however, of the great probability of some such promise and the fact that the instrument bears the signature of the testator, mere doubt as to whether the instrument was executed as claimed can not be considered. Could it be that the testator, knowing that the instrument was invalid as a will or codicil, and not appreciating that it might be used as the evidence of a promise, have so executed it for the mere purpose of satisfying the plaintiff and thereby securing the continuance of plaintiff's services without any real intention on his part of complying with his promise then or thereafter except as he might see fit. Could the plaintiff have been so deceived? No such deception should be attributed to the testator. Except that the agreed compensation is large, and greater probably than could be given in an action for the reasonable value of such services, there would be little hesitation in finding the agreement to be as claimed. Largeness, however, is only a matter of relation to many facts, including the character of the services, the condition under which they were rendered, the amount of the estate, the moral and legal claim thereto and the risk, taken in reliance upon mere testamentary compensation.

Under the circumstances of the case the existence of an agreement of the general nature of the agreement claimed, is very probable. The final agreement, of which the instrument of September 16, 1907, is simply evidential, gives to the original agreement such certainty as to be enforcible. It involves injustice to no one. The conditions under which the compensation was earned and was to be payable were such as to make reasonable a very liberal compensation. The evidence, therefore, in support of the final agreement, although not as clear and convincing as might be necessary under different conditions in this case is nevertheless, by reason of the undoubted signature of testator

to the instrument in question, sufficient to establish the agreement without in any way violating the rule of *Kling, Admr.,* v. *Bordman,* 65 O. S,. 86-103, or defeating that certainty in the succession of property intended to be insured by formally executed testamentary provision, or other distinctly established disposition by the owner. The contract in question is not supported simply by parole or circumstantial evidence, but by an instrument signed by an admittedly competent testator careful of his signature, which fixes with certainty the agreed compensation, and is therefore not within the rule given in *Owens* v. *McNally,* 113 Cal., 451; *Lisk* v. *Sherman,* 25 Barb., 439; *Sloniger* v. *Sloniger,* 161 Ill., 270; *Bolman* v. *Overall,* 80 Ala., 456; *Waterman on Spec. Perf.,* Section 41; *Dicken* v. *McKinley,* 163 Ill., 318; *Edson* v. *Parsons,* 155 N. Y., 555.

The instrument of September 16, 1907, can be considered however, in connection with other facts only as evidence of the agreement of Asa Van Wormer to give at his death to plaintiff for her services 150 shares of First National Bank stock in addition to the provisions already made.

Such agreement is a valid agreement (*Emery* v. *Darling,* 50 O. S., 150-166). Whether the remedy is in law or equity depends upon general principles.

The instrument is not a will or a codicil thereto. No specific shares of First National Bank stock were designated, set apart, or in any way removed from the testator's control. There was therefore no actual gift. There was no declaration of trust as to any specific shares, either oral in connection with the promise, or written in the instrument, and there is no evidence of any intention to hold any such shares for plaintiff's benefit. The agreement being valid in law, and the estate of the testator being ample to respond in damages, no constructive trust is necessary to give plaintiff the legal benefit thereof. The stocks agreed to be given or bequeathed have now, and have always had, an easily ascertained market value. The testator simply failed to perform his contract or to make any necessary provision therefor, but his estate is nevertheless liable upon the agreement. Plaintiff's remedy at law is adequate.

Without regard to the question as to whether the remedy of specific performance is applicable to a contract for the sale or delivery of personal property, the complete adequacy of the legal remedy in damages which precludes any equitable remedy, necessarily precludes the remedy of specific performance and any equitable remedy claimed by reason of any trust which might be created by any right to the remedy of specific performance.

Plaintiff's claim as duly presented and disallowed by the executor, was in *quantum meruit,* and plaintiff's original petition may be considered as of that nature.

The amended petition includes both *quantum meruit* and express contract.   As stated in *Railway* v. *Gaffney,* 65 O. S., 104-118:

"There is no generic difference between an express contract and one implied from circumstances."

Plaintiff's claim as presented to the executor and as sued upon both in the original and amended petition was for services. Whether for the reasonable value, or for an agreed compensation or both, plaintiff's claims constituted but one cause of action, and an amendment so as to change from one to the other, or to include both, does not change the cause of action.   Evidence in support of either, subject to the court's discretionary action, in case of surprise, could be offered in support of an allegation of either.   In so far, therefore, as any statute of limitations is applicable, it is applicable to the original petition and not the amended petition.   There is no claim that the statute of limitations applicable specifically to actions against executors or administrators bars plaintiff's claim under the original petition.

The six year limitation under the statute of limitations has no applicability to actions for continuous services rendered upon such a contract.   *Samuel Rudy* v. *Letitia Rudy,* 14 C.C.(N.S.), 545.

An agreement for compensation as claimed, has been established.   There was a breach of such agreement by the testator. His estate is liable in damages for the value of the stock not delivered in accordance with such agreement.